Tyler M. Paetkau (Bar No. 146305)
Olga Savage (Bar No. 252009)
PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
1117 S. California Ave., Suite 200
Palo Alto, CA 94304
Telephone:     (650) 645-9027
Facsimile:      (650) 687-8323
Email:          tyler.paetkau@procopio.com

Attorneys for Plaintiff and Counter-Defendant
JOHN BARKER

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN BARKER, individually and on behalf of all other persons similarly situated,<br><br>        Plaintiffs,<br><br>        vs.<br><br>INSIGHT GLOBAL, LLC, a Delaware limited liability company; and SECOND AMENDED AND RESTATED INSIGHT GLOBAL, LLC 2013 INCENTIVE UNIT PLAN,<br><br>        Defendants.<br><br>_____<br><br>INSIGHT GLOBAL, LLC, a Delaware limited liability company,<br><br>        Counter-Claimant,<br><br>        vs.<br><br>JOHN BARKER, an individual,<br><br>        Counter-Defendant. | **CASE NO.  16-cv-07186 BLF**<br><br>**PUTATIVE CLASS ACTION**<br><br>**THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF FOR:**<br><br>**(1)** **Declaratory Relief – 28 U.S.C. § 2201(a) (On Behalf of the Class);**<br>**(2)** **Unfair Competition – Cal. Bus. & Prof. Code §§ 17200 *et seq.* (On Behalf of the Class);**<br>**(3)** **Claim for Benefits - 29 U.S.C. § 1132(a)(1)(B);**<br>**(4)** **Interference with Right Under ERISA Plan – 29 U.S.C. §1140 (On Behalf of John Barker);**<br>**(5)** **Breach of Fiduciary Duty – 29 U.S.C. §§ 1109 and 1132(a)(3) (On Behalf of John Barker);**<br>**(6)** **Waiting Time Penalties – Cal. Labor Code § 203 (On Behalf of John Barker);**<br>**(7)** **Failure to Pay Unused Vested Paid Time Off at Termination – Cal. Labor Code § 227.3 (On Behalf of John Barker); and**<br>**(8)** **Defamation.**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff JOHN BARKER, by and through his attorneys, on behalf of himself and all others similarly situated, alleges the following against Defendants INSIGHT GLOBAL, LLC ("Insight") and SECOND AMENDED AND RESTATED INSIGHT GLOBAL, LLC 2013 INCENTIVE UNIT PLAN (the "Insight Plan") on information and belief formed after reasonable inquiry under the circumstances:

## THE PARTIES

1. Plaintiff John Barker is an individual residing in San Mateo, California.

2. Upon information and belief, Defendant Insight is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Atlanta, Georgia. Upon information and belief, Insight's members are citizens of the States of Georgia and New York.

3. Insight provides staffing services for companies in the information technology, finance, accounting, engineering and government industries. Insight maintains offices in San Jose, California and San Francisco, California, and conducts substantial business in California.

4. Upon information and belief, Defendant Insight Plan is a deferred compensation plan that is intended to provide additional compensation to attract, retain and reward a select group of management or highly compensated employees, including Plaintiff John Barker, which is administered by Defendant Insight's Board of Directors. Upon information and belief, Defendant Insight alleges that Defendant Insight Plan is governed by the Employee Retirement Income Security Act ("ERISA").

5. John Barker worked for Insight from March 13, 2006 to October 26, 2016, when Insight abruptly terminated his employment without justification or cause. From September 2009 to October 26, 2016, Mr. Barker worked as an Account Manager, Sales Manager and Director of Operations out of Insight's San Jose and San Francisco, California offices, and resided in California.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1332(a). As described in paragraphs 1 and 2, above, there is complete diversity of citizenship between

Plaintiff Barker, a citizen of the State of California, and Defendant Insight, a citizen of the States of Georgia and New York.  The amount in controversy in this case exceeds the sum or value of $75,000.00, exclusive of interest and costs.

7.  Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events and omissions giving rise to the claims alleged herein occurred in this district.

## FACTUAL BACKGROUND

8.  Insight hired Mr. Barker as Recruiter on or about March 13, 2006.  From September 2009 to October 26, 2016, Mr. Barker worked as an Account Manager, Sales Manager and Director of Operations out of Insight's San Jose and San Francisco, California offices.

9.  At the beginning of his employment with Insight, Mr. Barker worked out of Insight's Atlanta, Georgia office.  Mr. Barker worked out of Insight's Atlanta, Georgia office until approximately February 2008, when Mr. Barker relocated to Insight's Irvine, California office.

10. Insight provided Mr. Barker an offer letter that purported to set out the terms and conditions of his employment on or about March 28, 2006, and another offer letter on or about May 9, 2007.  Both offer letters contained provisions prohibiting Mr. Barker from soliciting Insight's employees and customers for one year after the termination of Mr. Barker's employment with Insight, as well as a non-compete provision stating that, for one year after the termination of his employment with Insight, Mr. Barker may not "engage in technical staffing services within a 50 mile radius of any Insight Global, Inc. office in which [Mr. Barker] worked during the last year of [Mr. Barker's] employment with Insight Global, Inc."  Even though the non-compete provision and the non-solicitation of customers provision in Mr. Barker's offer letters are facially invalid and unlawful under California law, Insight did not provide Mr. Barker with a revised offer letter excluding those provisions, or inform Mr. Barker that these provisions no longer applied to him, when Mr. Barker relocated to Insight's Irvine, California office in 2008.

11. Over the course of Mr. Barker's employment with Insight, Insight and Mr. Barker executed several versions of an At-Will Employment Agreement.  Mr. Barker and Insight executed an At-Will Employment Agreement on or about October 31, 2011 and on or about

November 17, 2015. A true and correct version of the most recent At-Will Employment Agreement executed by Mr. Barker is attached as Exhibit 1.

12. The At-Will Employment Agreement contains a provision entitled "Agreement Not to Solicit Customers and Clients," which states that, for one year after the termination of Mr. Barker's employment with Insight, Mr. Barker:

> shall not directly or indirectly solicit, or attempt to solicit, on behalf of any Competing Staffing Business ... any actual or prospective customer or client of [Insight] (a) regarding whom [Mr. Barker] was responsible for collecting, compiling or recording Confidential Business Information or trade Secrets for [Insight], or (b) about whom [Mr. Barker] received Confidential Business Information or Trade Secrets as a result of [Mr. Barker's] employment with [Insight].

At-Will Employment Agreement, ¶5, attached as Exhibit 1.

13. The Non-Solicitation of Customers provision in the At-Will Employment Agreement was not necessary to protect Insight's claimed "Trade Secrets" and, upon information and belief, was an attempt by Insight to prevent Mr. Barker from competing with Insight after the termination of his employment. Indeed, a separate provision in the At-Will Employment Agreement addressed the protection of Insight's claimed "Trade Secrets."

14. The non-solicitation of customers provision in the At-Will Employment Agreement placed a substantial segment of the market off limits to Mr. Barker; deterred, interfered with and restricted his ability to earn a living and his mobility in his chosen profession, the temporary staffing industry; and its mere inclusion constitutes an unfair business practice under California law.

15. The At-Will Employment Agreement also contains a provision entitled "Agreement Not to Solicit Employees," which states that, for one year after the termination of Mr. Barker's employment with Insight, Mr. Barker:

> shall not directly or indirectly, or in concert with others, solicit or encourage any person who is an employee of, or contractor or consultant for, [Insight], to resign from or terminate such employment or consulting relationship with [Insight]. [Mr. Barker] further agrees that [Mr. Barker] shall not, during the Restricted Period, directly or indirectly, or in concert with others, solicit or encourage any person who is, or within one year prior to

the solicitation was, an employee of [Insight] providing staffing services for [Insight], to perform staffing services for any corporation, individual, enterprise, entity or association that competes with [Insight] in [Insight's] Business.

At-Will Employment Agreement, ¶4, attached as Exhibit 1.

16. The Non-Solicitation of Employees provision in the At-Will Employment Agreement was not necessary to protect Insight's claimed "Trade Secrets" and, upon information and belief, was an attempt by Insight to prevent Insight's employees, including Mr. Barker, from competing with Insight after the termination of their employment. Indeed, a separate provision in the At-Will Employment Agreement addressed the protection of Insight's claimed "Trade Secrets."

17. The non-solicitation of employees provision in the At-Will Employment Agreement deterred, interfered with and restricted Insight's employees' (including Mr. Barker's) ability to earn a living and their mobility in their chosen profession, the temporary staffing industry; and its mere inclusion constitutes an unfair business practice under California law.

18. The At-Will Employment Agreement also contains a provision stating that, if Mr. Barker accepted employment with a "Competing Staffing Business" within one year after the termination of Mr. Barker's employment with Insight, Mr. Barker "shall give written notice to [Insight] of such employment immediately upon acceptance of said employment, and in no event less than fourteen (14) days prior to commencement of such employment." At-Will Employment Agreement, ¶13. A separate provision in the At-Will Employment Agreement required Mr. Barker to provide a copy of the At-Will Employment Agreement (including all Trade Secret protections contained therein) to any potential or actual new employer. *See id.* Thus, the notice provision in the At-Will Employment Agreement was not necessary to protect Insight's "Trade Secrets" and, upon information and belief, was another attempt by Insight to make it difficult or impossible for Mr. Barker to compete with Insight after the termination of his employment.

19. In or about January 2013, Insight and Mr. Barker entered into a SECOND AMENDED AND RESTATED INSIGHT GLOBAL, LLC 2013 INCENTIVE UNIT PLAN (the "Insight Plan"), a true and correct copy of which is attached as Exhibit 2. Under the terms of the Insight Plan, Mr. Barker was entitled to receive payment after the termination of his employment with Insight of units of value accumulated over the course of his employment with Insight, *i.e.*, deferred

compensation.

20. The Insight Plan provided that "[i]f termination of employment is by the Company for 'cause' (as determined by the Board), the Employee shall forfeit all Units previously awarded and shall have no right to receive, and the Company shall have no obligation to pay, any amounts under the Plan." Incentive Unit Plan, ¶10(a), attached as Exhibit 2.

21. The Insight Plan also conditioned payment of earned compensation under the Insight Plan on compliance for 24 months after the termination of employment with Insight with several non-compete and non-solicitation provisions that are unlawful, void and unenforceable under California law, including without limitation provisions prohibiting the employee from:

- "[e]ngaging in the business of providing or placing temporary or permanent technical staffing or other technical services within a radius of 50 miles" of either the office where the employee last worked or any other office where the employee worked during the two years preceding the termination of his employment;
- Soliciting or accepting business from any person who was a customer of Insight in the two years prior to the date of termination of the employee's employment;
- Inducing or attempting to induce any person who was an employee of Insight in the two years prior to the alleged inducement to leave Insight's employ; and
- "solicit[ing], divert[ing] or tak[ing] way any trade, business or good will from" Insight or competing for any accounts or personnel that became known to the employee through his employment with Insight.

Insight Plan, ¶¶10(c)(i)-(v), attached as Exhibit 2.

22. The Insight Plan contains a Severability provision, which states that the non-compete and non-solicitation provisions "shall not apply to Employees who are residents of the State of California at the time of termination of Employment." Insight Plan, ¶17.

23. During his ten and a half years of employment with Insight, Mr. Barker was an excellent employee and consistently received positive reviews and feedback regarding his work performance.

24. On October 26, 2016, Insight abruptly terminated Mr. Barker's employment without

warning or explanation. Insight's General Counsel and Secretary, David C. Lowance, Jr., sent a letter to Mr. Barker in which he stated "I regret to inform you that we consider your termination to be for 'cause,'" a true and correct copy of which is attached as Exhibit 3. Insight did not provide Mr. Barker with a reason for his termination or an explanation as to why it allegedly considered the termination of his employment to be for "cause." Upon information and belief, Insight did not terminate Mr. Barker's employment for cause. Upon information and belief, Insight falsely claimed that the termination of Mr. Barker's employment was for "cause" in order to unfairly deprive Mr. Barker of his right to receive payment of the units of value accumulated over the course of his employment under the Insight Plan, *i.e.*, his earned deferred compensation in the amount of approximately $344,304.00.

25. After terminating Mr. Barker's employment, Insight, through its employees (including without limitation Mr. Barker's manager, Matt Gonsalves), maliciously published provably false statements concerning Mr. Barker, including without limitation that Mr. Barker had allegedly "cussed out" Mr. Gonsalves and made inappropriate statements to him and that Mr. Barker allegedly "was not performing well on his sales metrics," or words to that effect. Insight's employees, including without limitation Mr. Gonsalves, were acting in the course and scope of their employment when they published the above false statements about Mr. Barker.

26. Even though the non-compete and non-solicitation provisions in the Insight Plan are unlawful, void and unenforceable under California law and do not apply to Mr. Barker under the explicit terms of the Insight Plan's Severability provision, and even though the non-solicitation provision in the At-Will Employment Agreement is unlawful, void and unenforceable under California law, Mr. Lowance's termination letter to Mr. Barker unlawfully and falsely "reminded" Mr. Barker of his alleged obligations "not to (1) compete against Insight Global in its lines of business within certain geographic areas, (2) solicit any of the customers or prospective customers with whom you had material contact while at Insight Global (regardless of location)." Mr. Lowance's letter warned Mr. Barker that violation of these unlawful, void and unenforceable provisions "could result in serious consequences, including legal action or the forfeiture of all right to payment for IUP Units previously awarded to you."

27. Upon information and belief, Insight now acknowledges that its non-compete and non-solicitation of customers provisions in the Insight Plan do not apply to Mr. Barker. Insight maintains that its non-solicitation of employees provision is enforceable against Mr. Barker and that Mr. Barker violated the non-solicitation of employees provision. Insight has filed a Counterclaim against Mr. Barker alleging that Mr. Barker violated the non-solicitation of employees provision, and Defendants cited Mr. Barker's alleged violation of the non-solicitation of employees provision as an additional basis for denying Mr. Barker his earned deferred compensation under the Plan.

28. Mr. Barker has requested that Insight execute a stipulation that it will not seek to enforce the non-solicitation of customers provision in the At-Will Employment Agreement against Mr. Barker, but Insight has failed and refused to so stipulate.

29. Additionally, Insight failed to pay Mr. Barker his last wages on the date of his termination. Insight did not provide Mr. Barker with his alleged final paycheck until November 4, 2016. Mr. Barker's alleged final paycheck also did not include his unused, vested Paid Time Off, including accrued, unpaid vacation wages under California law.

30. Mr. Barker needed to obtain new employment immediately to support himself and his family. Mr. Barker's experience and training is in the staffing industry, and, in order to obtain new employment and to engage in his profession of choice, Mr. Barker must be able to accept employment with companies that compete with Insight.

## CLASS ACTION ALLEGATIONS

31. Upon information and belief, Insight has a practice of including in its employment agreements with and offer letters to its California employees certain anti-competitive non-solicitation of customers and non-solicitation of employees provisions that are facially unlawful, void and unenforceable under California law.

32. Insight's inclusion of facially unlawful non-solicitation of customers and non-solicitation of employees provisions in its offer letters and employment agreements directly undermines the fundamental statutory policy (articulated in California Business and Professions Code section 16600) favoring competition and employee mobility. Insight's mere inclusion of the unlawful

non-solicitation provisions undermines and inhibits competition and employee mobility, because the average employee would honor the unlawful provision without consulting counsel or challenging the provision in court. Additionally, the mere inclusion of the unlawful non-solicitation provisions discourages employees from terminating their employment with Insight and seeking employment with a competitor or forming a competing business, because the unlawful provisions place a substantial segment of the market off limits to the employees and restrict their ability to earn a living and their mobility in their chosen profession, the temporary staffing industry.

33. Mr. Barker brings his First and Second Claims for Relief on behalf of himself and all others similarly situated pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure. The class is defined as follows:

> All persons employed at any time by Insight in California during the period from December 15, 2012 to the present who signed an employment agreement with Insight or received an offer letter from Insight that contained a non-solicitation of customers and/or non-solicitation of employees provision.

34. Mr. Barker is informed and believes that Insight employed as many as 1,000 employees in California during the period from December 15, 2012 to the present. Mr. Barker is informed and believes that Insight included, and continues to include, unlawful anti-solicitation of customers and employees provisions in its employment agreements with and/or offer letters to all of its California employees.

35. The questions of law or fact common to the class include without limitation:

> a. Whether the non-solicitation of customers and non-solicitation of employees provisions in Insight's employment agreements with and offer letters to its California employees are unlawful, void and unenforceable under Business and Professions Code section 16600;

> b. Whether the class members are entitled to declaratory relief that they have the immediate right to solicit and obtain business from Insight's customers and potential customers upon the termination of their employment with Insight and to solicit Insight's employees, and that Insight's non-solicitation of customers and

employees provisions are unlawful, void and unenforceable;

    c.  Whether Insight's mere inclusion of the facially unlawful non-solicitation provisions constitutes unlawful, unfair and/or fraudulent business acts or practices prohibited by California Business and Professions Code sections 17200, *et seq.*; and

    d.  The type and measure of damages suffered by Mr. Barker and the class.

36. These and other questions of law and fact are common to the class, and predominate over any questions affecting only individuals in the class.

37. Mr. Barker's claims are typical of the claims of the class.

38. Mr. Barker will fairly and adequately represent the interests of the class and has no conflict with the interests of the class.

39. Mr. Barker has retained competent counsel experienced in employment, restrictive covenant, unfair competition and class action litigation to represent himself and the class.

40. Insight has acted on grounds generally applicable to the class, thereby making final injunctive relief appropriate with respect to the class as a whole.

41. This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. By contrast, prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Insight and its current and former California-based employees.

## **FIRST CLAIM FOR RELIEF**

(Declaratory Relief - 28 U.S.C. § 2201(a))

(On Behalf of the Class)

(Against Defendant Insight)

42. Plaintiff John Barker, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference the allegations of paragraphs 1 through 41, inclusive, above, as though fully set forth herein.

43. A real and actual controversy of sufficient immediacy and reality to warrant declaratory relief exists between the parties as to the enforceability of the non-solicitation of customers and non-solicitation of employees provisions in Insight's employment agreements with and offer letters to its California employees.

44. On information and belief, Insight contends that the class members must abide by their alleged contractual obligation to not solicit any actual or prospective customers and employees of Insight for one year after the termination of their employment with Insight. In fact, Insight's General Counsel and Secretary, David C. Lowance, Jr., reminded Mr. Barker of his alleged non-solicitation obligation in his October 26, 2016 letter advising Mr. Barker of the termination of his employment. *See* attached Exhibit 3. Insight has filed a Counterclaim against Mr. Barker alleging that Mr. Barker violated the non-solicitation of employees provision, and Defendants cited Mr. Barker's alleged violation of the non-solicitation of employees provision as an additional basis for denying Mr. Barker his earned deferred compensation under the Plan.

45. Mr. Barker, on behalf of himself and all others similarly situated, contends that the non-solicitation provisions in Insight's employment agreements and offer letters are unlawful restrictions on the class members' ability to engage in their profession of choice, and are void and unenforceable under California Business and Professions Code section 16600 and the case law interpreting and applying it.

46. The controversy between the class members and Insight is thus real and substantial. Mr. Barker, on behalf of himself and all others similarly situated, demands specific relief through a decree of a conclusive character that the class members have the immediate right to solicit and obtain business from Insight's customers and potential customers and solicit Insight's employees upon the termination of their employment with Insight. The nature and extent of the adverse legal interests between the class members and Insight are apparent, and the controversy is definite and concrete.

47. The class members are entitled to a declaratory judgment that they have the immediate right to solicit and obtain business from Insight's customers and solicit Insight's employees upon the termination of their employment with Insight.

48. Additionally, the class members are entitled to a temporary restraining order and preliminary and permanent injunctions enjoining and restraining Defendants from enforcing the unlawful and unenforceable non-solicitation provisions. Mr. Barker is informed and believes, and on that basis alleges, that unless Insight is enjoined, it will seek to enforce its unlawful and unenforceable non-solicitation provision, thus inflicting great and irreparable harm on Mr. Barker and the class members. The class members' remedy at law is not by itself adequate to compensate them for the harm inflicted by Insight.

## SECOND CLAIM FOR RELIEF

(Unfair Competition – Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

(On Behalf of the Class)

(Against Defendant Insight)

49. Plaintiff John Barker, on behalf of himself and all others similarly situated, hereby refers to and incorporates each and every allegation set forth in paragraphs 1 through 48, inclusive, of this Complaint as though fully set forth herein.

50. Insight's conduct as described herein, including without limitation the inclusion of facially unlawful non-solicitation of customers and employees provisions in its offer letters to and employment agreements with the class members, constitutes unlawful, unfair and/or fraudulent business acts or practices prohibited by California Business and Professions Code sections 17200, *et seq.*

51. Insight's inclusion of facially unlawful non-solicitation of customers and employees provisions in its offer letters and employment agreements directly undermine the fundamental statutory policy (articulated in Business and Professions Code section 16600) favoring competition and employee mobility. The mere inclusion of the unlawful non-solicitation provisions is an unlawful and unfair business practice because the average employee would honor the unlawful provision without consulting counsel or challenging the provision in court. Additionally, the mere inclusion of the unlawful non-solicitation provisions discourages employees from terminating their employment with Insight and seeking employment with a competitor or forming a competing business, because the unlawful provisions place a substantial

segment of the market off limits to the employees.    Thus, as a direct and proximate result of the inclusion of the unlawful provision, the class members have suffered damages and Insight has profited.

52. Insight's unlawful conduct was a substantial factor in causing the class members' damages.

53. By this action, the class members seek full restitution of Insight's ill-gotten gains and injunctive relief prohibiting Insight from enforcing any of its unlawful and void restrictive covenants against the class members and relief prohibiting Insight from including any of its unlawful and void restrictive covenants in its offer letters and employment agreements, pursuant to Section 17203 of the California Business and Professions Code.

### THIRD CLAIM FOR RELIEF

(Claim for Benefits - 29 U.S.C. § 1132(a)(1)(B))

(On Behalf of John Barker)

(Against Defendants Insight and Insight Plan)

54. Plaintiff John Barker hereby refers to and incorporates each and every allegation set forth in paragraphs 1 through 53, inclusive, of this Complaint as though fully set forth herein.

55. Under the Insight Plan, Mr. Barker was entitled to receive payment after the termination of his employment with Insight of units of value accumulated over the course of his employment with Insight in the amount of $344,304.00.

56. Upon information and belief, Insight alleges that the Insight Plan is governed by ERISA.

57. Insight unfairly deprived Mr. Barker of his right to obtain the benefits that he was entitled to receive under the Incentive Unit Plan by terminating Mr. Barker's employment and falsely claiming that Mr. Barker's termination was for "cause."  Upon information and belief, Insight falsely claimed that the termination of Mr. Barker's employment was for "cause" in order to unfairly deprive Mr. Barker of his right to receive payment of the units of value accumulated over the course of his employment under the Incentive Unit Plan.

58. Mr. Barker is not obligated to exhaust the Insight Plan's administrative appeals process because any resort by Mr. Barker to the administrative process would be futile, in that there is a certainty of an adverse decision.  Upon information and belief, Insight terminated Mr. Barker's

employment (and falsely claimed that the termination of Mr. Barker's employment was for "cause") specifically in order to deprive Mr. Barker of the benefits of the Insight Plan. Thus, an appeal to Insight's Board of Directors (the same Board which, according to Paragraph 10(a) of the Plan, made the purported determination that Mr. Barker's termination was for "cause") would be futile.

59. Pursuant to Section 502(a)(1)(B) of ERISA, Mr. Barker is owed, and seeks recovery of, the units of value accumulated over the course of his employment with Insight under the Insight Plan in the amount of $344,304.00.

## FOURTH CLAIM FOR RELIEF

(Interference with Right Under ERISA Plan – 29 U.S.C. §1140)

(On Behalf of John Barker)

(Against Defendant Insight)

60. Plaintiff John Barker hereby refers to and incorporates each and every allegation set forth in paragraphs 1 through 59, inclusive, of this Complaint as though fully set forth herein.

61. Under Section 510 of ERISA, it is unlawful for an employer to discharge, fine, suspend, expel, discipline, or discriminate against a participant in or a beneficiary of an ERISA plan for the purpose of interfering with the attainment of any right to which such participant may become entitled under the Plan.

62. Upon information and belief, Insight terminated Mr. Barker's employment and falsely claimed that the termination of Mr. Barker's employment was for "cause" in order to, and with the specific intent to, unfairly interfere with Mr. Barker's right to receive payment of the units of value accumulated over the course of his employment under the Insight Plan to which Mr. Barker was entitled, and with the specific intent of violating Section 510 of ERISA

63. Mr. Barker is entitled to appropriate equitable relief to remedy Insight's violation of Section 510 of ERISA.

# FIFTH CLAIM FOR RELIEF

(Breach of Fiduciary Duty – 29 U.S.C. §§ 1109 and 1132(a)(3))

(On Behalf of John Barker)

(Against Defendant Insight)

64. Plaintiff John Barker hereby refers to and incorporates each and every allegation set forth in paragraphs 1 through 63, inclusive, of this Complaint as though fully set forth herein.

65. As the administrator of the Insight Plan with sole and absolute discretionary authority and responsibility over the Insight Plan, Insight had a fiduciary duty to the Insight Plan and its participants and beneficiaries, including without limitation Plaintiff John Barker, to act solely in the interest of the Plan participants and with the exclusive purpose of providing benefits to them.

66. Insight breached its fiduciary duty by, among other things, (1) terminating Mr. Barker's employment (and falsely claiming that the termination of Mr. Barker's employment was for "cause") with the specific intent to deprive Mr. Barker of the benefits of the Insight Plan; (2) implementing and participating in a biased and pre-determined claims procedure in which participants making claims for benefits are not afforded the same opportunity as Insight to present evidence of their entitlement to benefits, and in which the person advocating on behalf of Insight and against the Plan participant, Insight's General Counsel David Lowance, also acts as the decision maker's legal counsel and as secretary during the claim review proceedings; and (3) using the Plan as "golden handcuffs" to prevent its former employees from competing with Insight, by denying benefits to any employee who leaves Insight to work for a competitor.

67. Mr. Barker is informed and believes that Insight has a pattern and practice of using its facially unlawful post-employment restrictive covenants, including non-solicitation of customers, clients and employees provisions, as a weapon in its ongoing unfair and unlawful competition scheme. Insight in its sole and absolute discretion determines whether former employee-Plan participants forfeit hundreds of thousands of dollars in earned, deferred compensation if they leave Insight to work for a competitor, citing its facially unlawful restrictive covenants as "cause" for termination and forfeiture of earned, deferred compensation. Insight also uses its facially unlawful post-employment restrictive covenants to threaten and intimidate Insight employee-Participants

and its employees generally from leaving to work for the competition, and the specific purpose and intent of furthering its unlawful competition scheme by threatening employee-Participants with forfeiture of hundreds of thousands of dollars in earned, deferred compensation if they leave to work for a competitor..

68. As a result of Insight's breach of its fiduciary duty, Mr. Barker suffered injury separate and distinct from denial of benefits, including without limitation the wrongful termination of his employment, and therefore is entitled to recover additional damages under Section 502(a)(3) of ERISA.

## **SIXTH CLAIM FOR RELIEF**

(Waiting Time Penalties – Cal. Labor Code § 203)

(On Behalf of John Barker)

(Against Defendant Insight)

69. Plaintiff John Barker hereby refers to and incorporates each and every allegation set forth in paragraphs 1 through 68, inclusive, of this Complaint as though fully set forth herein.

70. Labor Code section 201(a) requires an employer who discharges an employee to pay all compensation due and owing to the employee immediately upon discharge. Labor Code section 203 provides that if an employer willfully fails to pay compensation promptly upon discharge, the employer is liable for waiting time penalties in the form of continued compensation for up to thirty workdays.

71. Insight willfully failed to pay Mr. Barker to timely pay Mr. Barker's compensation and wages upon termination. Insight did not provide Mr. Barker with his alleged final paycheck until November 4, 2016, seven business days after his termination. Mr. Barker's alleged final paycheck also did not include his unused, vested Paid Time Off.

72. Mr. Barker is entitled to waiting time penalties under Labor Code section 203.

## SEVENTH CLAIM FOR RELIEF

(Failure to Pay Unused Vested Paid Time Off at Termination – Cal. Labor Code § 227.3)

(On Behalf of John Barker)

(Against Defendant Insight)

73. Plaintiff John Barker hereby refers to and incorporates each and every allegation set forth in paragraphs 1 through 72, inclusive, of this Complaint as though fully set forth herein.

74. At the time of the termination of Mr. Barker's employment with Insight, Mr. Barker had unused, vested Paid Time Off.

75. Insight failed to pay Mr. Barker his unused, vested Paid Time Off.

76. Insight's conduct resulted in harm to Mr. Barker, in an amount to be proved at trial of this action.

## EIGHTH CLAIM FOR RELIEF

(Defamation)

(On Behalf of John Barker)

(Against Defendant Insight)

77. Plaintiff John Barker hereby refers to and incorporates each and every allegation set forth in paragraphs 1 through 76, inclusive, of this Complaint as though fully set forth herein.

78. Insight, through its employees acting in the course and scope of their employment, intentionally and maliciously published, and caused to be published, numerous false, defamatory, unprivileged statements concerning Mr. Barker, to third parties who understood the defamatory meaning and application to Mr. Barker, which have a natural tendency to injure or that cause special damage to Mr. Baker, as they tend to injure Mr. Barker in respect to his office, business or profession and, by natural consequence, cause actual damage to Mr. Barker, including without limitation that Mr. Barker had allegedly "cussed out" his manager, Matt Gonsalves, and made inappropriate statements to him, and that Mr. Barker allegedly "was not performing well on his sales metrics," or words to that effect

79. In publishing the above false statements of fact, and other provably false statements of fact, Insight acted with malice, ill will, revenge and spite toward Mr. Barker. Insight's actions

evidenced a willingness and desire to vex and injure Mr. Barker.

80. As a result of Insight's false, malicious and defamatory statements, Mr. Barker has suffered general damages according to proof, including limitation loss of reputation, mortification, shame and hurt feelings.

81. As a result of Insight's false, malicious and defamatory statements, Mr. Barker has suffered special damages according to proof, including without limitation damage to Mr. Barker's property, business, trade, profession or occupation.

82. In publishing the above false statements of fact, and other provably false statements of fact, Insight acted with malice, ill will, revenge and spite toward Mr. Barker justifying an award of punitive damages to make an example of and punish Insight, and to deter future unlawful conduct such as the defamation and other unlawful conduct described in this Complaint, in an amount to be determined by the jury at the trial of this action.

## PRAYER FOR RELIEF

WHEREFORE, as a result of the foregoing, Plaintiff JOHN BARKER, on behalf of himself and all others similarly situated, prays for relief as follows:

1.      Certification of the class, with Mr. Barker as the designated Class Representative and his counsel as Class Counsel;

2.      Recovery of actual damages from Insight according to proof at trial, including without limitation all compensation due to Mr. Barker under the Incentive Unit Plan;

3.      A declaratory judgment that the class members have the immediate right to solicit and obtain business from Insight's customers and solicit Insight's employees after the termination of their employment with Insight.

4.      A temporary restraining order and preliminary and permanent injunctions enjoining and restraining Insight from enforcing the unlawful and unenforceable non-solicitation of customers and employees provisions and including the unlawful and unenforceable non-solicitation of customers and employees provisions in subsequent employment agreements with and offer letters to California employees.

5.      Recovery of restitution from Insight in an amount to be determined at trial, and/or

any interest in money or property, which may have been acquired by means of Insight's unfair competition and other unlawful acts;

     6.     Where appropriate under the Cause of Action alleged, an award of punitive damages;

     7.     Where appropriate under the Cause of Action, an award of emotional distress damages;

     8.     An award of civil penalties pursuant to Labor Code section 203;

     9.     Mr. Barker's attorneys' fees incurred in connection with this action, including prevailing party contractual attorney's fees based on a judgment finding that the contractual provisions are void and unenforceable and statutory attorney's fees pursuant to Labor Code section 2802(c);

     10.     Mr. Barker's costs incurred in connection with this action; and

     11.     Such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiff JOHN BARKER demands a trial by jury on all issues triable of right by jury.

DATED: January 8, 2018          PROCOPIO, CORY, HARGREAVES & SAVITCH LLP

          By:     _____/s/Tyler M. Paetkau_____
               Tyler M. Paetkau (Bar No. 146305)
               Olga Savage (Bar No. 252009)
               Attorneys for Plaintiff and Counter-Defendant
               JOHN BARKER

# EXHIBIT 1



## AT-WILL EMPLOYMENT AGREEMENT

THIS AT-WILL EMPLOYMENT AGREEMENT (the "Agreement") is executed by and between John Barker ("Employee") and Insight Global, LLC ("Employer"), on the date reflected on the last page of this Agreement.

## RECITALS

**WHEREAS,** Employer is in the business of providing staffing services including, without limitation, temporary staff augmentation, contingent recruitment, and permanent placement ("Employer's Business");

**WHEREAS,** Employee and Employer desire that Employee become employed by, or continue employment with, Employer to engage in Employer's Business and to receive specialized training, Confidential Business Information and Trade Secrets (each as defined below), and substantial compensation from Employer;

**WHEREAS,** as an employee of Employer, Employee has gained and/or will gain, specialized knowledge of, training in, and experience with all aspects of Employer's Business, including but not limited to, knowledge and experience relating to Employer's technology, pricing, profit margins, operating costs, bidding procedures, business development strategies, customer information, customer lists, employee and consultant compensation, and other secret and confidential information relating to Employer's customers and clients, employees, and consultants, and has established and/or will establish personal relationships with Employer's own employees and contractors, all by reason of having worked for Employer; and

**WHEREAS,** as an employee of Employer, Employee has and/or will regularly communicate with Employer's customers and clients and Employer's prospective customers and clients, and their respective personnel, engage in making or soliciting sales or obtaining orders or contracts for services, and thereby gain a high level of knowledge about Employer's customers, clients and other business relationships; and

**WHEREAS,** Employee acknowledges and agrees that the covenants contained in this Agreement are reasonable and necessary to protect Employer's legitimate business interest in protecting itself from unfair competition, including the unfair use of Employer's Confidential Business Information and Trade Secrets and interference with Employer's beneficial relationships with its other employees and contractors. Employee acknowledges that Employer would not be willing to employ Employee, or provide Employee the specialized training, Confidential Information, and Trade Secrets Employee will receive during employment by Employer, absent Employee's agreement to such covenants.

Rev.June.2013

BARKER_0000117

**NOW, THEREFORE,** in consideration of the premises, the mutual covenants and agreements contained herein, the employment of Employee by Employer, and other good and valuable consideration, the parties agree as follows:

1. <u>EMPLOYMENT AT WILL.</u> Employee acknowledges that Employee is employed by Employer for an indefinite period of time and on a terminable-at-will basis. Employee's employment with Employer may be revoked, terminated, changed, or modified by Employer from time to time, including, without limitation, Employee's compensation, duties, title, or place of employment, at Employer's discretion, with or without cause, without notice, and without any liability on the part of Employer. Employee shall, at all times during Employee's employment, devote Employee's entire time, attention, energies, efforts and skills, with undivided loyalty, to the business of Employer and use Employee's best efforts to promote the interest and business of Employer. Employee agrees that during the term of Employee's employment with Employer, Employee shall give Employer prompt notice of any and all business opportunities within the scope of Employer's Business of which Employee learns and will not take advantage of or assist another individual or entity in taking advantage of such opportunities.

2. <u>CONFIDENTIAL BUSINESS INFORMATION.</u> Employee agrees not to use, disclose or exploit any Confidential Business Information belonging to Employer, or provided to Employer by a third party pursuant to an obligation of confidentiality, except as necessary to perform Employee's duties on behalf of Employer. The obligations stated in this Section 2 shall survive the termination of this Agreement and/or the termination of Employee's employment with Employer and shall continue for so long as such data or information meets the definition of Confidential Business Information as stated below. Employee further agrees to take all appropriate action, whether by instruction, agreement or otherwise, to insure the protection, confidentiality and security of all Confidential Business Information. For purposes of this Agreement, Confidential Business Information means any information (a) relating to the business of Employer, (b) disclosed to Employee or of which Employee is aware due to his employment with Employer, (c) that has value to Employer, and (d) that is not generally known to competitors of Employer. Examples of Employer's Confidential Business Information include its methods of operation; marketing, recruiting, and placement strategies; names of customers and clients and prospective customers and clients specifically targeted by Employer; names, responsibilities and needs and preferences of the personnel of Employer's current and prospective customers and clients who purchase staffing services; past, current and prospective consultant lists and consultant information; past, current, and prospective employee lists and employee information; employee and consultant performance and productivity information; employee and consultant compensation rates and structure; costs, pricing, margins, and related information and projections; client account books; personnel data; and similar information; provided, however, that Confidential Business Information shall not include data or information (x) that has been voluntarily disclosed to the public by Employer (although not by Employee without authorization of Employer), (y) that has been independently developed and disclosed by others with proper authority to do so, or (z) that has otherwise entered the public domain through lawful means. Confidential Business Information may also include, without limitation, information relating to Employer's legal affairs, financial accounting, employee disciplinary

Page 2 of 9

Rev.June.2013

BARKER_0000118

matters, internal investigations, and other nonpublic information, the disclosure of which could injure Employer. Employer's Confidential Business Information includes information that may also constitute Trade Secrets (as defined below) because the terms are not intended to be mutually exclusive. Employee's agreement to protect Confidential Business Information belonging to Employer extends to instances in which Employee is using non-Employer computer resources, such as personal e-mail, internet and instant messaging accounts, as well as computer equipment not owned by Employer. Employee further agrees to report immediately to Employer any incident that may compromise or has compromised Confidential Business Information, including, without limitation, the loss or theft of any hard copy of such information, any disk or drive containing such information, or any laptop or desktop computer, whether Employer-owned or otherwise, containing such information. Employee agrees to abide by and follow all Employer-mandated standards relating to the creation, maintenance, use, and preservation of the confidentiality of passwords and encryption methods for protecting Confidential Business Information.

3.    TRADE SECRETS.  Employee agrees not to use or disclose any Trade Secret of Employer at any time during or after his employment without Employer's prior written consent. "Trade Secret" means information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, an invention, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, marketing or business development plans, or a list of actual or potential customers or clients  or their personnel, consultants, or employees which: (i) is not commonly known by or available to the public; (ii) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (iii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

4.    AGREEMENT NOT TO SOLICIT EMPLOYEES.  Employee agrees that, during Employee's employment with Employer and for one (1) year after the termination of such employment (the "Restricted Period"), Employee shall not directly or indirectly, or in concert with others, solicit or encourage any person who is an employee of, or contractor or consultant for, Employer, to resign from or terminate such employment or consulting relationship with Employer.  Employee further agrees that Employee shall not, during the Restricted Period, directly or indirectly, or in concert with others, solicit or encourage any person who is, or within one year prior to the solicitation was, an employee of Employer providing staffing services for Employer, to perform staffing services for any corporation, individual, enterprise, entity or association that competes with Employer in Employer's Business (a "Competing Staffing Business").

5.    AGREEMENT NOT TO SOLICIT CUSTOMERS AND CLIENTS. Except when acting for and on behalf of Employer, Employee agrees that, during the Restricted Period, Employee shall not directly or indirectly solicit, or attempt to solicit, on behalf of any Competing Staffing Business (including, without limitation, any Competing Staffing Business owned or operated by Employee) any actual or prospective customer or client of Employer  (a) regarding whom

Page 3 of 9

BARKER_0000119

Employee was responsible for collecting, compiling, or recording Confidential Business Information or Trade Secrets for Employer, or (b) about whom Employee received Confidential Business Information or Trade Secrets as a result of Employee's employment with Employer.

6.     IRREPARABLE HARM.    In the event of any breach or threatened breach of any of Sections 2, 3, 4, 5, 10, 11, 12, or 13 of this Agreement, Employee acknowledges and agrees that Employer would be irreparably harmed thereby and that any remedies at law would be inadequate. Accordingly, Employee agrees that in such event, Employer shall be entitled to immediate injunctive or other equitable relief to restrain or enjoin any such breach and such other monetary or equitable relief as deemed appropriate by the court. The parties expressly waive any requirement for a bond to be posted in conjunction with a request for a temporary, preliminary or permanent injunction.

7.     REASONABLE RESTRICTIONS.    Employee agrees that the time, territorial and other limitations in Sections 2, 3, 4, 5, 10, 11, 12, and 13 are reasonable and properly required for the adequate protection of Employer's legitimate business interests, including its Trade Secrets and Confidential Business Information. If any provision of this Agreement is found unreasonable or overbroad by a court of competent jurisdiction, then Employee and Employer agree that the court shall modify such provision to make it reasonable and enforce it as modified. In addition, even if a limitation is found to be overbroad or unreasonable in one State, Employee agrees to be bound by the limitation in all other applicable States.

8.     SEVERABILITY OF RESTRICTIVE COVENANTS. The covenants contained in this Agreement are distinct and severable from one another. If any provision or any part of any provision of this Agreement is held invalid or unenforceable by any court, such holding shall not affect the validity or enforceability of any other provisions hereof, all of which shall remain in full force and effect. Specifically, and without limiting the generality of the foregoing sentences, Employee agrees that if any portion, or all, of Sections 2, 3, 4, or 5 is found unreasonable by a court of law or equity, and the court finds that particular section invalid as a matter of law, the remaining Sections of this Agreement shall remain enforceable and Employee shall remain bound by the remaining such Sections.

9.     TOLLING OF RESTRICTIONS.    In the event that Employee breaches any of the prohibitions against soliciting customers or the personnel of Employer, as described above, then the parties agree that the corresponding Restricted Period will be tolled for the duration of such breach. In addition, in the event that either party initiates litigation in an attempt to confirm or enforce its rights under this Agreement, the parties further agree that the Restricted Period for the disputed prohibition(s) shall be tolled during the period of time in which such litigation is pending, including any appeal.

10.    MONITORING AND INSPECTION OF COMPUTER USE AND ACTIVITY. Employee agrees that Employer has the right, exercisable in its sole discretion, to monitor and review any electronic data that is viewed, edited, stored, drafted, saved, or transmitted on any computer equipment, systems, and computer-related resources, including without limitation,

Rev.

smart phones, cellular phones, internet, e-mail and instant messaging accounts, that are owned, leased, or utilized by Employer or otherwise used by any employees, independent contractors or consultants of Employer in the course of the services they provide to Employer. Employee further agrees that Employer has the right to limit the use by Employee of its computer equipment, systems, and computer-related resources, and Employee agrees not to use Employer's computer equipment, systems, or resources for any communications in which Employee claims any right or expectation of privacy. Employee agrees that Employer may inspect, at any time, whether during Employee's employment, or subsequent to the termination of Employee's employment, the entire contents of any electronic data storage device or any e-mail or instant messaging account to which any Confidential Business Information, Trade Secret, or any other information or communication relating to Employer's Business is or has been viewed, edited, saved, transmitted, or received by Employee, including, without limitation, any of Employer's or Employee's computer hard drives, portable drives, thumb drives, software, e-mail, instant messaging accounts, smart phones, or cellular phones. Employee acknowledges that Employer will routinely monitor, track and, in some instances, ascertain the identity of the authors, recipients, and contents of computer-based communications from and/or to Employee. Employer's right to monitor computer use and activity includes the right to review the content of any and all electronic communications using Employer's computer equipment or networks or otherwise relating to Employer's Business. **By signing this Agreement, Employee knowingly and voluntarily consents to being monitored and to having such communications reviewed by Employer, and Employee specifically acknowledges Employer's right to conduct all such monitoring.** Employee is aware that Employee has no individual rights to the contents or use of Employer's computer resources, and all data on or material created using Employer's computer resources is Employer's property. Employee acknowledges that Employee has no expectation of privacy for any Internet or other use via Employer-owned or -provided connections or while using Employer's computer equipment, systems, or resources.

11.   RETURN OF EMPLOYER PROPERTY AND INFORMATION. Immediately upon termination of Employee's employment for any reason, or at any other time that Employer requests in writing, Employee shall return to Employer all materials, information, property and equipment of Employer in the possession or under control of Employee including, without limitation, any and all Confidential Business Information and Trade Secrets and copies or derivatives thereof, any electronic storage device or media on which any Confidential Business Information and/or Trade Secrets have at any time been stored, including, without limitation, hard drives, portable drives, thumb drives, disks or other storage devices, computer equipment, computer files, audio/video tape recordings, records, documents, drawings, specifications, lists, equipment and supplies, promotional materials, scripts and similar items relating to the business of Employer, and all copies thereof or extracts therefrom. Employee agrees that he shall not retain any lists, notes or records of the names, contact information or preferences of any customers or clients of Employer, any of Employer's employees, independent contractors or consultants, or any individuals placed on assignments by Employer. To the extent that any such information is stored on any personal electronic device of Employee, including but not limited to a smartphone or similar device, Employee agrees to promptly delete all such information upon

Rev.June.2013

BARKER_0000121

termination of employment and, upon request of Employer, certify in writing the destruction of same.

12.    NON-DISPARAGEMENT.    Employee agrees that, following the termination of employment, Employee will not make any derogatory or disparaging statement about Employer or any of its products or services, employees, consultants, officers, directors, or shareholders, or any of them, nor directly or indirectly take any action which is intended to embarrass any of them.

13.    FUTURE EMPLOYMENT.  Employee agrees that, during the Restricted Period, Employee will provide a complete copy of this Agreement to any potential new employer or actual new employer prior to beginning employment with such potential or actual employer.  Employee further agrees that, should Employee accept employment or other relationship for remuneration with any Competing Staffing Business, Employee shall give written notice to Employer of such employment immediately upon acceptance of said employment, and in no event less than fourteen (14) days prior to commencement of such employment.  This written notice shall include an affidavit or declaration under penalty of perjury by Employee stating that Employee has complied fully with the requirements of Section 11 of this Agreement and that Employee has not and shall not breach the Confidential Business Information, Trade Secret, and Nonsolicitation provisions of this Agreement, to the extent applicable, and that Employee has provided a copy of this Agreement to the new employer.  Employee agrees that failure to provide the written notice and affirmation required by this section shall constitute a breach of this Agreement and may cause Employer irreparable harm.  Employee's provision of the written notice and affirmation of compliance shall not preclude Employer from commencing litigation to enforce this Agreement where Employer has cause to believe that, notwithstanding such assurances, Employee has breached or will breach any provision of this Agreement.

14.    ACCURATE IDENTIFICATION OF EMPLOYER.    Employee agrees that during employment with Employer, Employee will represent himself as being employed solely by Insight Global, LLC or one of its affiliate or subsidiary companies.  Employee acknowledges and understands that Insight Global, LLC is not affiliated in any way with Insight Enterprises, Insight Direct USA, Insight Global Finance or Insight Public Sector, or any of their parents, subsidiaries, or affiliated companies.  Employee will not refer to Employer as simply "Insight," either in ·writing or verbally, during any discussions with current or potential customers or clients or current or potential suppliers or vendors. During discussions with potential customers, Employee must clearly identify Insight Global as a staffing services company or as a company that provides staffing services.

15.    ATTORNEY FEES AND COSTS.    In any suit or other proceeding by Employer to determine, confirm, or enforce Employer's rights under this Agreement, Employer shall be entitled to an award of its attorney fees, expert witness fees, and all costs and expenses of litigation and appeal incurred in connection with any claim on which Employer prevails.

16.    GOVERNING LAW.    ALL QUESTIONS CONCERNING THE CONSTRUCTION, VALIDITY, ENFORCEMENT AND INTERPRETATION OF THIS AGREEMENT SHALL

Rev.June.2013

BARKER_0000122

BE GOVERNED BY THE INTERNAL LAW OF THE STATE OF CALIFORNIA WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF CALIFORNIA OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF CALIFORNIA.

17.    WAIVER OF JURY TRIAL.    THE PARTIES EXPRESSLY AGREE TO WAIVE ANY RIGHT TO A TRIAL BY JURY FOR ANY LITIGATION INITIATED THAT ARISES OUT OF OR IS RELATED TO THIS AGREEMENT OR EMPLOYEE'S EMPLOYMENT WITH EMPLOYER.

18.    NO INCONSISTENT OBLIGATIONS.    Employee is aware of no obligations, legal or otherwise, inconsistent with the terms of this Agreement or with Employee's undertaking employment with the Company.  Employee will not disclose to Employer, or use or induce Employer to use, any protected confidential information or trade secrets of others.  Employee represents and warrants that Employee has returned all property and protected confidential information belonging to all prior employers.

19.    AMENDMENTS.    No amendments to this Agreement shall be effective unless in writing and signed by the parties.

20.    NO WAIVER.    The waiver by any party hereto of the breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent, contemporaneous, or other breach of any party.

21.    ENTIRE AGREEMENT.    This Agreement constitutes the entire understanding of the parties hereto with respect to the subject matter hereof.  There are no restrictions, promises, warranties, covenants or undertakings other than those expressly set forth herein.  This Agreement supersedes all prior negotiations, agreements, and undertakings between the parties hereto with respect to such subject matter.

22.    NO PARTY THE DRAFTER.    The parties agree that they have reviewed this Agreement and have had the opportunity to have counsel review this Agreement, and, accordingly, neither Employee nor Employer shall be deemed the drafter of this Agreement.

23.    NOTICE AND SERVICE OF PROCESS.  Any notice provided for in this Agreement shall be in writing and shall be either personally delivered, sent by reputable overnight courier service and a second copy sent by regular first-class mail, or sent by telecopy (with a second, hard copy to follow by regular first class mail).  Notices to the Employee may be sent to the address indicated on the last page of this Agreement, and notices to the Employer may be sent to:

Rev.June.2013

BARKER_0000123

Insight Global
4170 Ashford Dunwoody Road
Suite 250
Atlanta, Georgia 30319
Attn: Legal Department
Fax: (404) 257-1070

with copies to:
Insight Global
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

or to any other address as to any of the parties hereto, as such party shall designate in a written notice to the other party hereto. All notices sent pursuant to the terms of this Section shall be deemed received (i) if personally delivered, then on the date of delivery, (ii) if sent by telecopy, then on the date of transmission, or (iii) if sent by overnight, express carrier, then on the next federal banking date immediately following the day sent. Each party agrees that such notice shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.

24.    <u>COUNTERPARTS</u>.    This Agreement may be executed in multiple counterpart copies and by facsimile signatures, each and all of which will be deemed an original.

25.    <u>SURVIVAL OF OBLIGATIONS</u>.    The covenants contained in this agreement shall survive termination of Employee's employment to the extent provided herein, regardless of who causes the termination and under what circumstances.

26.    <u>ASSIGNMENT</u>.    Employee understands and agrees that Employee's duties and responsibilities under this Agreement are personal in nature and that this Agreement shall not be assigned, transferred or shared by Employee with any other person or entity without the prior written notification to and written approval of Employer, which approval may be withheld in the sole discretion of Employer. Employee further acknowledges and agrees that this Agreement and the rights and obligation of Employer hereunder may be assigned by Employer to an affiliate or successor by purchase or otherwise of Employer without Employee's prior written approval, upon notice to Employee.

*[Signatures appear on next page.]*

Rev.June.2013

BARKER_0000124

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date(s) below.

**EMPLOYEE:**

Signature: _____

Print Name: John Barker

Date: 11/17/2015

Address: 1609 DE ANZA BLVD.

SAN MATEO, CA 94403

**EMPLOYER:**

INSIGHT GLOBAL, LLC

By: _____

Name: Kevin M. Ingham

Title: SVP, Human Resources

Date: _____

Rev.June.2013

BARKER_0000125

# EXHIBIT 2

# INSIGHT GLOBAL, LLC

## SECOND AMENDED AND RESTATED

## 2013 INCENTIVE UNIT PLAN

WHEREAS, this Plan (as defined below) was originally adopted by the Company (as defined below) on December 19, 2012 and amended and restated effective January 16, 2013;

WHEREAS, in accordance with Section 14 of the Plan, the Board (as defined below) desires to amend the Plan;

NOW THEREFORE, effective on July 11, 2014, the Plan is amended and restated in its entirety as set forth below:

1.     <u>Purposes of the Plan</u>

This Plan is intended to provide additional compensation to attract, retain and reward a select group of management or highly compensated employees, an incentive to promote the best interests of the Company, and in particular, an incentive to promote the long term economic growth of the Company. Accordingly, the Company may award to such employees as may be selected, in the manner hereinafter provided, Units, subject to the terms and conditions of the Plan.

2.     <u>Definitions</u>

The following terms shall have the meanings respectively indicated:

    (a)    "<u>2007 Plan</u>" means the Company's 2007 Incentive Investment Plan, as amended from time to time.

    (b)    "<u>2007 Plan Account</u>" means an Employee's "Account" (as such term is defined in the 2007 Plan) under the 2007 Plan.

    (c)    "<u>Account</u>" means the account established by the Company in the name of each Employee who is awarded Units under the Plan, to record the transactions herein described.

    (d)    "<u>Affiliate</u>" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such specified Person.

    (e)    "<u>Board</u>" means the Board of Directors of Holdings, provided that if the Board has designated its authority to a committee, references to the Board shall be deemed to refer to such committee.

    (f)    "<u>Change in Control Event</u>" means a change in the ownership or effective control of the Company, or in the ownership of a substantial portion of the assets of the

Company, as defined in guidance issued by the U.S. Treasury Department for purposes of Section 409A(a)(2)(A)(v) of the Code

(g)    "Code" means the Internal Revenue Code of 1986, as amended.

(h)    "Company" means Insight Global, LLC.

(i)    "control" means, with respect to any Person, the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and words such as "controlled" and "controlling" have meanings correlative to the foregoing.

(j)    "Disability" means the inability of an Employee to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than 12 months.

(k)    "Effective Date" means January 1, 2013.

(l)    "Employee" means any person engaged or proposed to be engaged as a director, officer or employee of the Company or one of its Affiliates.

(m)    "Grant Letter" means a written agreement between the Company and the Employee evidencing the terms and conditions of an individual award of Units. The Grant Letter is subject to the terms and conditions of the Plan, and those terms and conditions contained in the Grant Letter shall be null and void to the extent inconsistent with the terms and conditions of the Plan.

(n)    "Holdings" means IG Igloo Holdings, Inc., the indirect parent company of the Company.

(o)    "Person" means any individual, partnership, corporation, limited liability company, trust, other business entity, governmental entity or group.

(p)    "Plan" means this Second Amended and Restated Insight Global, LLC 2013 Incentive Unit Plan, as amended from time to time.

(q)    "Restricted Period" means the 24-month period following the date of an Employee's termination of employment.

(r)    "termination of employment" means, with respect to an Employee, that such Employee has had a "separation from service" as defined in Treasury Regulation Section 1.409A-1(h).

(s)    "Unit" means a measure of value granted pursuant to the Plan.

2116/39654-001 current/43772157v3

(t)    "<u>Unit Value</u>" means, as of any date, the value assigned to an individual Unit as of such date, as determined in the sole discretion of the Board.

## 3.    <u>Administration of the Plan</u>

The Plan shall be administered by the Board. The Board may establish such rules and regulations as it deems necessary or advisable to determine eligibility to participate in the Plan and for the proper administration of the Plan and may amend or revoke any rule or regulation so established. The Board shall make all other determinations necessary or advisable for the administration of the Plan and shall correct any defect or supply any omission or reconcile any inconsistency in the Plan in the manner and to the extent the Board deems necessary or advisable. No member of the Board shall be liable, in the absence of bad faith, for any act or omission with respect to his or her services in administering the Plan.

Any determination, evaluation, election, decision, approval, authorization, consent, selection, revocation, amendment or other action that is made, given or taken by the Board or the Company (each a "<u>determination</u>") under the Plan may be made, given or taken by the Board or the Company in its sole and absolute discretion. Each such determination shall be binding on the Company and each holder of Units. Neither the Board nor the Company shall have any duty or obligation to give any consideration to any interest or factors affecting any past or present Employees in making, giving or taking any determination. Without limiting the foregoing, nothing in the Plan shall obligate the Board or the Company to treat all or any past or present Employees alike, and the exercise of any power or discretion by the Board or the Company in the case of any past or present Employee shall not create any obligation on the part of the Board or the Company to take any similar action in the case of any other past or present Employee.

No provision contained in the Plan, nor any rule or regulation established by the Board in its administration of this Plan, shall be construed to:

(a)    give an Employee any right to be awarded any Units other than as determined by the Board;

(b)    give an Employee any rights whatsoever with respect to membership interests in the Company;

(c)    limit in any way the right of the Company to terminate an Employee's employment with the Company or any of its Affiliates at any time; or

(d)    be evidence of any agreement or understanding, express or implied, that the Company or any of its Affiliates will employ an Employee for any particular period, in any particular position, at any particular rate of remuneration or on any particular terms.

## 4.    <u>Units Available for Award</u>

The total number of Units available for award in any year shall be determined by the Board. The total number of Units available for award in the aggregate during the term of the Plan shall be 6,250,000.

2116/39654-001 current/43772157v3

5.    Eligibility

Employees eligible to be awarded Units shall be selected by the Board from key Employees of the Company. In selecting Employees eligible to receive awards of Units, and in determining the number of Units to be awarded to each Employee, the Board may consider the office or position held by the Employee, the Employee's degree of responsibility for and contribution to the growth and success of the Company, the Employee's length of service, promotions, potential or any other factors which it may consider relevant. Only Employees who are both (a) select management or highly compensated Employees (as determined by the Board) and (b) "highly compensated employees" as defined in Section 414(q)(1)(B) of the Code at the time of the award, may be eligible to receive awards of Units. Neither eligibility nor selection for participation in the Plan in any one year guarantees eligibility or selection for participation in the Plan in any other year.

6.    Awards of Units, Acceptance of Awards

In accordance with the provisions of this Plan, the Board shall select each year the Employees to whom Units shall be awarded, shall determine the number of Units to be included in each award, shall establish the time (if any) within which Employees selected must accept such award and the method of such acceptance, and shall establish such other provisions as the Board may deem necessary or advisable. Each award shall be represented by a Grant Letter.

7.    Credits to the Account

The Board shall initially credit to the Account of each Employee who has been awarded Units, the Units awarded. Subsequently, from time to time, the Board may determine the Unit Value and each Employee's Account shall be adjusted (upwards or downwards) appropriately to reflect such Unit Value. The Unit Value shall be determined without reference to any other units awarded under any other plan maintained by the Company and may be greater or lesser than the value of any such other units, as the Board shall determine in its sole discretion. All determinations of Unit Value and amounts credited to or deducted from the Account of each Employee who has Units shall be made by the Board, whose determinations shall be binding upon the Company and all holders of Units.

The Board shall not be obligated to determine Unit Value using the same or similar method as any prior determination or determinations of Unit Value and the exercise of the Board's discretion in using any particular method to determine Unit Value shall not create any obligation on the part of the Board to make any future determinations using the same or similar method.

8.    Non-transferability of Units or Account

Neither the Units awarded under the Plan nor any right to payment for the value of such Units or the Account shall be subject to any transfer, assignment, pledge, hypothecation, execution or attachment. Any attempt to transfer, assign, pledge, hypothecate or otherwise dispose of, or to subject to execution, attachment or similar process, any Units, interest in the Account or right to payment contrary to the provisions of this Plan shall be void and ineffectual, shall give no right to the purported transferee and shall result in forfeiture of the Units involved in such attempt.

4

9.    In-Service Distribution Election

Each Employee who did not previously make an in-service distribution election (including 0%) under the 2007 Plan shall be entitled to make a one-time election, within the time prescribed under Section 409A of the Code (or such shorter period as required by the Company), to receive a distribution of either 5%, 10%, 15% or 20%, as elected, of the Unit Value credited to his or her Account as of the December 31 immediately prior to each year in which a distribution is elected to be taken;  provided that, unless otherwise permitted under Section 409A of the Code, the amount distributable pursuant to an in-service distribution election shall be limited to the Unit Value of Units earned by the Employee after the date of such in-service distribution election. With respect to any Employee who is a participant in both the 2007 Plan and the Plan, (a) any in-service distribution election previously made by such Employee under the 2007 Plan (i) automatically shall apply to the Plan and (ii) shall apply to such Employee's Account and 2007 Plan Account in the aggregate; and (b) any in-service distribution shall be made first from the Unit Value of Units earned by the Employee under the Plan and thereafter from the Unit Value of Units earned by the Employee under the 2007 Plan.  The elected amount will be paid in periodic installments every one, three or five years from the year in which the election is made. Payments pursuant to this Section 9 may be made by the Company or one or more of its designees in cash, by the cancellation of indebtedness of the Employee to the Company or any of its Affiliates, or any combination thereof, in each case, as determined by the Board. Distributions elected pursuant to this Section 9 shall be made only so long as the Employee remains employed by, or provides services to, the Company or one of its Affiliates.   Upon the Employee's termination of employment, payments pursuant to this Section 9 shall cease and the remaining balance in the Employee's Account shall be paid as provided in Section 10.

10.    Right to Payment for Account

Subject to the provisions of this Section 10, the Company or one or more of its designees shall pay to each Employee who has been awarded Units the Unit Value credited to his or her Account as of the date of termination of employment with the Company, at the time and in the manner set forth below.

    (a)    If termination of employment is by the Company for "cause" (as determined by the Board), the Employee shall forfeit all Units previously awarded and shall have no right to receive, and the Company shall have no obligation to pay, any amounts under the Plan.

    (b)    Except as provided under Section 10(d), if termination of employment is due to death or Disability, payment shall be made in equal installments over five years (except with respect to interest accrued under Section 10(e)) in accordance with the Company's regular payroll schedule, beginning on the first regularly-scheduled payroll date following the date of termination.

    (c)    Except as provided under Section 10(d), if termination of employment is due to any reason other than "cause," death or Disability, payment shall be made in equal installments over five years (except with respect to interest accrued under Section 10(e)) in accordance with the Company's regular payroll schedule,

5

beginning on the first regularly-scheduled payroll date following the expiration of the Restricted Period, subject to the condition that during the Restricted Period the Employee shall not either directly on his own behalf or indirectly through any entity in, or on behalf of or with respect to, which the Employee is an officer, director, trustee, shareholder, creditor, employee, partner, or consultant:

(i) Engage in the business of providing or placing temporary or permanent technical staffing or other technical services within a radius of 50 miles of either (A) the office in which the Employee last worked or (B) any other office in which the Employee worked during the two years preceding termination of employment;

(ii) Approach, contact or solicit any Person that, at any time within two years prior to the date of termination of the Employee's employment, was a client or customer of the Company or any of its Affiliates to provide such Person with any temporary or permanent technical staffing or other technical services or accept any engagement for temporary or permanent technical staffing or other technical services from any such Person;

(iii) Induce or attempt to induce any Person who (A) is an employee of the Company or any of its Affiliates to leave the employ of the Company or any of its Affiliates or any of their respective customers or clients or (B) is or had been, during the two years prior to such inducement or attempted inducement, an employee of the Company or any of its Affiliates or any of their respective customers or clients, to solicit, divert or take away from the Company or any of its Affiliates any staff or personnel;

(iv) Solicit, divert or take away any trade, business or good will from the Company or any of its Affiliates; compete for accounts or personnel that became known to the Employee through his employment with the Company or any of its Affiliates; influence any customers of the Company or any of its Affiliates not to do business with the Company or any of its Affiliates; or attempt to do any of the foregoing; or

(v) Use, divulge or disclose (A) the name or address or any information concerning any account of the Company or any of its Affiliates to any other Person or (B) any proprietary, trade secret or confidential information or knowledge of the Company acquired by the Employee while in the employ of the Company or any of its Affiliates, which confidential information shall include the Company's and its Affiliates' business methods, techniques, and management and financial expertise, as well as its plans with respect to acquisitions and future services to be rendered.

(d) If, at any time, the Unit Value credited to an Employee's Account, 2007 Plan Account and "Account" under the Company's 2011 Incentive Investment Plan (as the term "Account" is defined in such 2011 Incentive Investment Plan), in the

2116/39654-001 current/43772157v3

aggregate, is not greater than the applicable dollar amount under Section 402(g)(1)(B) of the Code, the Company may, in its discretion, require the payment of all such amounts to be made in the form of a lump sum to such Employee at such time.

(e)  From and after the expiration of the Restricted Period (or, if termination of employment if due to death or Disability, from and after the 30th day following an Employee's termination of employment), the remaining balance in his or her Account shall earn simple interest at 4% per annum until fully paid. At the time of each installment paid under Section 10(b) or 10(c), all interest accrued through each such date of payment shall be distributed.

(f)  Payments pursuant to this Section 10 may be made in cash, by the cancellation of indebtedness of the Employee to the Company or any of its Affiliates, or any combination thereof, in each case, as determined by the Board.

(g)  Payments pursuant to this Section 10 shall be made only if an Employee executes and delivers (if requested by the Company), and does not revoke, a release in form and substance acceptable to the Company of all claims (whether known or unknown) within 60 days after the date of termination of employment.

11.  Beneficiary Designation

Each Employee awarded a Unit shall have the right to designate a beneficiary or beneficiaries to receive payment under this Plan in the event of his or her death. Such designation of beneficiary shall be in writing in such manner as the Company shall require, shall be signed by the Employee, and shall be delivered to the Company at its principal office. Such designation shall be effective when received. The Employee shall have the right to change such designation by filing a new designation, in the same manner, with the Company. Any such change will be deemed to revoke all prior designations unless a contrary intention is expressly stated in the change of designation. In the event an Employee fails to validly designate a beneficiary, or if no designated beneficiary survives an Employee, any payment due under the terms of the Plan shall be paid to the Employee's spouse, if surviving, and if there is no surviving spouse, to the Employee's estate.

12.  Liability of Company for Payment; Unfunded Plan

It is the Company's intention that the amounts deferred under this Plan shall be an unfunded unsecured promise to pay money for tax purposes. Accounts established under the Plan shall be for bookkeeping and accounting purposes only and shall not require the Company to actually establish, maintain or credit any amounts to any Account. The Company's only obligation to Employees to whom Units have been awarded shall be to make payments as described in Sections 9 and 10. Any Account established, maintained or credited by the Company shall be solely for the purpose of aiding the Company in measuring and meeting its obligations under this Plan and no escrow, trust or trust fund is intended. To the extent that the Company does, in its discretion, establish, maintain or credit an escrow, trust or trust fund, or otherwise set aside any funds to satisfy liabilities under this Plan, the Company will be the sole owner of such escrow,

trust or trust fund and none of the Employee, a beneficiary of the Employee or any other Person shall have any legal or equitable interest therein. Nothing stated herein will cause such escrow, trust or trust fund to be treated as anything but the general assets of the Company, subject to the claims of its general creditors, nor will anything stated herein cause such escrow, trust or trust fund to represent the vested, secured or preferred interest of an Employee or his beneficiaries. The Company shall have the right at any time to use any amounts in such escrow, trust or trust fund in the ordinary course of its business. The right of an Employee or any other Person in an Account to receive payment thereof shall not be greater than nor have any preference or priority over the rights of any other general unsecured creditor of the Company.

13.    Withholding Taxes

An Employee awarded Units under this Plan shall be conclusively deemed to have authorized the Company and its Affiliates to withhold from the payments made hereunder, funds in amounts equal to applicable federal and state withholding taxes and any other amounts required by law to be withheld, at the time or times such amounts are due.

14.    Amendment, Modification, Suspension or Discontinuance of Plan

The Board may (a) from time to time alter, amend or revise this Plan in any respect whatsoever or suspend or discontinue this Plan, and (b) at any time, including in connection with a Change of Control Event, terminate this Plan, in each case, subject to the requirements of Section 409A of the Code.

15.    No Rights of Member

Units are not membership interests in the Company and Employees who are granted Units shall not have any of the rights of a member of the Company. Neither the Plan nor the grant of any Units hereunder shall give any Employee any right with respect to the continuation of employment with the Company or any of its Affiliates.

16.    Claims Procedure

Any claims or disputes arising under the Plan shall be submitted and determined under the procedures set forth in Appendix A.

17.    Severability of Provisions

If at any time any of the provisions of Section 10(c) of the Plan shall be held invalid or unenforceable or are prohibited by the laws of the jurisdiction where they are to be performed or enforced, by reason of being vague or unreasonable as to duration or geographic scope or scope of activities restricted, or for any other reason, such provisions shall be considered divisible and shall become and be immediately amended to include only such restrictions and to such extent as shall be deemed to be reasonable and enforceable by the court or other body having jurisdiction over this Plan, and such provisions, as so amended, shall be valid and binding as though any invalid or unenforceable provision had not been included herein. Sections 10(c)(i), (ii) and (iv) shall not apply to Employees who are residents of the State of California at the time of termination of employment.

8.

18. Governing Law

This Plan and all rights, obligations, matters and disputes arising hereunder, shall be construed in accordance with and governed by the laws of the State of Delaware.

19. Construction; Headings and Captions

Wherever any words are used in this Plan in the masculine gender they shall be construed as though they were also used in the feminine gender in all cases where they would so apply. As used herein, (a) "or" shall mean "and/or" and (b) "including" or "include" shall mean "including, without limitation."

The headings and captions herein are provided for reference and convenience only, shall not be considered part of the Plan, and shall not be employed in the construction of the Plan.

20. Other Benefits

No Units awarded, or amounts paid out with respect thereto, under the Plan shall be deemed compensation for purposes of computing benefits under any retirement plan of the Company or any of its Affiliates or shall affect any benefits under any other benefit plan now or subsequently in effect under which the availability or amount of benefits is related to the level of compensation, unless otherwise expressly specified under such retirement plan or benefit plan.

21. Successor and Assigns

The Plan shall be binding on all successors and permitted assigns of an Employee, including the beneficiary of such Employee and the estate of such Employee and the executor, administrator or trustee of such estate.

22. Term; Member and Stockholder Approval

This Plan is effective as of the Effective Date and automatically shall expire on December 31, 2022 (the "Expiration Date"), unless terminated earlier in accordance with the terms of the Plan. After the Expiration Date, no new Units may be awarded, however, the terms of the Plan shall continue to govern unpaid amounts with respect to Units awarded prior to the Expiration Date. The Company may submit this Plan to the Company's members and to the stockholders of Holdings for their approval in compliance with the Delaware Limited Liability Company Law and the Delaware General Corporation Law, respectively.

23. Compliance with Section 409A

Although the Company makes no guarantee with respect to the tax treatment of payments and benefits hereunder, the Plan is intended to comply with the applicable requirements of Section 409A of the Code and the regulations and Internal Revenue Service guidance thereunder, and shall be limited, construed and interpreted in accordance with such intent. Accordingly, the Board may amend the provisions of this Plan at any time to avoid the imposition of an excise tax under Section 409A on any payments deferred, accrued or to be made hereunder. In no event shall the Company or any of its Affiliates be liable for any additional tax, interest or penalty that

may be imposed on an Employee by Section 409A or for damages for failing to comply with Section 409A, other than for withholding or other obligations applicable to employers, if any, under Section 409A. For purposes of Section 409A, each installment of any payment under the Plan that is made in two or more installments shall be treated as a separate payment.

24.   Integration with 2007 and 2011 Plans

If the application of any provision of this Plan is inconsistent with the application of the provisions of the 2007 Plan or the 2011 Incentive Investment Plan, the provisions of this Plan shall prevail.

2116/39654-001 current/43772157v3

## Appendix A

### Claims Procedure

(a)    An Employee's request for Plan benefits will be considered a claim for Plan benefits, and it will be subject to a full and fair review. If a claim is wholly or partially denied, the Board will provide the Employee with a written or electronic notification of the Plan's adverse determination. This written or electronic notification must be provided within a reasonable period of time, but not later than 90 days after the receipt of the claim by the Board, unless the Board determines that special circumstances require an extension of time for processing your claim. If the Board determines that an extension of time for processing is required, written notice of the extension will be furnished to the Employee prior to the termination of the initial 90-day period. In no event will such extension exceed a period of 90 days from the end of such initial period. The extension notice will indicate the special circumstances requiring an extension of time and the date by which the Plan expects to render the benefit determination.

(b)    The Board's written or electronic notification of any adverse benefit determination must contain the following information:

        (i)    The specific reason or reasons for the adverse determination.

        (ii)    Reference to the specific Plan provisions on which the determination is based.

        (iii)    A description of any additional material or information necessary for the claimant to perfect the claim, and an explanation of why such material or information is necessary.

        (iv)    A description of the Plan's review procedures and the time limits applicable to such procedures, including (if applicable) a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following an adverse benefit determination on review.

(c)    If the disposition of a claim is not communicated by the Board to the claimant within the timeframes outlined in this section, the claimant will be deemed to have exhausted the claims procedures of the Plan. If a claim has been denied, the claimant may submit the claim for review, and must follow the claims review procedures described in subsection (d) below.

(d)    Upon the denial of a claim for benefits, a claimant may file a claim for review in writing with the Board.

        (i)    A claimant must file the claim for review no later than 60 days after the claimant has received written notification of the denial of a claim for benefits.

11

(ii)    A claimant may submit written comments, documents, records, and other information relating to a claim for benefits.

(iii)    A claimant will be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to a claim for benefits.

(iv)    A claim for review must be given a full and fair review. This review will take into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

(e)    The Board will provide the claimant with written or electronic notification of the Board's benefit determination on review. The Board must provide the claimant with this determination within a reasonable amount of time, but no later than 60 days after the Board's receipt of a written claim for review, unless the Board determines that special circumstances require an extension of time for processing the claim. If the Board determines that an extension of time for processing is required, written notice of the extension will be furnished to the claimant prior to the termination of the initial 60-day period. In no event will such extension exceed a period of 60 days from the end of the initial period. The extension notice will indicate the special circumstances requiring an extension of time and the date by which the Board expects to render the determination on review. In the case of an adverse benefit determination, the notification will set forth:

(i)    The specific reason or reasons for the adverse determination.

(ii)    Reference to the specific Plan provisions on which the benefit determination is based.

(iii)    A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim for benefits.

(iv)    A statement describing any voluntary appeals procedures offered by the Plan and the claimant's right to obtain the information about such procedures, and (if applicable) a statement of the claimant's right to bring an action under Section 502(a) of ERISA after the claimant has exhausted the Plan's claims review procedures set forth above.

(f)    The Plan's claims review procedures must be exhausted before challenging an adverse benefits determination in court. If the claimant has exhausted the Plan's claims review procedures, or if a claim has not been decided within the timeframes required above, then the claimant may file suit in state or federal court.

12

# EXHIBIT 3

 INSIGHTGLOBAL

4170 Ashford Dunwoody Rd., Suite 250
Atlanta, GA 30319
404-257-7900
404-257-1070 Fax

October 26, 2016

*Via UPS Overnight Delivery*

Mr. John Barker
1609 De Anza Boulevard
San Mateo, California 94403

Re:     *Termination from Insight Global*

Dear John:

This letter is to confirm that we have terminated your employment with Insight Global, effective immediately. I regret to inform you that we consider your termination to be for "cause."

In addition, this letter is to remind you of certain obligations contained in your At-Will Employment Agreement with Insight Global and the Incentive Unit Plans under which you were granted Units. As you are aware, these documents contain restrictions designed to protect Insight Global's confidential business information and goodwill from actions by former employees, including commitments not to (1) compete against Insight Global in its lines of business within certain geographic areas, (2) solicit any of the customers or prospective customers with whom you had material contact while at Insight Global (regardless of location), (3) solicit, or help another employer to solicit, any Insight Global employees to leave Insight Global, or (4) use or disclose any confidential or trade secret information of Insight Global. They also include a prohibition on you making any derogatory or disparaging statements about Insight Global or its employees. Engaging in these activities within the two (2) years following termination of your employment could result in serious consequences, including legal action or the forfeiture of all right to payment for IUP Units previously awarded to you.

We are sorry that such action is necessary.

Sincerely,

David C. Lowance, Jr.
General Counsel and Secretary